**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____ :
                                             :

NEW JERSEY DEPARTMENT OF       :
ENVIRONMENTAL PROTECTION, et al.,:
                                             :

                    Plaintiffs,    :      Civil Action No. 15-6468 (FLW) (LHG)
                                             :

          v.                 :
                                           :         **OPINION**

AMERADA HESS CORPORATION,    :
                                           :

                    Defendants.   :
_____ :

**WOLFSON, Chief Judge:**

      Presently before the Court is a motion by Defendant Getty Properties Corp. ("Getty") and a separate motion by Defendant H.P. Delta. Inc. ("H.P. Delta") and Third-Party Defendant Dhandi Transport Inc. ("Dhandi") (collectively, with Getty, "Moving Defendants") to exclude the opinions of expert witness Anthony K. Brown ("Brown") related to the H.P. Delta trial site ("H.P. Delta Site").[1] Plaintiffs New Jersey Department of Environmental Protection ("NJDEP"), the Commissioner of the New Jersey Department of Environmental Protection, and the Administrator of the New Jersey Spill Compensation Fund (collectively "Plaintiffs") oppose Moving Defendants' motions. Plaintiffs brought this suit for past and future primary and compensatory restoration damages under the New Jersey Spill Compensation and Control Act,

---

[1] Getty seeks to exclude all of Brown's opinions, while Dhandi and H.P. Delta (who has joined Dhandi's motion) seek to exclude only a subset of Brown's opinions related to causation.

N.J.S.A. 58:10-23.11 *et seq.* (the "Spill Act"), the Water Pollution Control Act, N.J.S.A.

58:10A-1 to 35 ("WPCA"), and the common law of the State of New Jersey. For the reasons

stated herein, Moving Defendants' motions are denied.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual background of this matter is set forth in detail in *New Jersey Dep't of Envtl.*

*Prot. v. Amerada Hess Corp.*, 323 F.R.D. 213 (D.N.J. 2017) and in *New Jersey Dep't of Envtl.*

*Prot. v. Amerada Hess Corp.*, No. 15-6468, 2018 WL 2317534 (D.N.J. May 22, 2018). Plaintiffs

seek to recover against Defendants for injuries to the groundwater of the State of New Jersey

alleged to have been caused by the discharge of Methyl Tertiary Butyl Ether ("MTBE"), on and

around properties owned and/or controlled by Defendants.[2]

As relevant to the present motions, the H.P. Delta site is located at 439 Lake Avenue in

Colonia, New Jersey. *See* Declaration of Lila Wynne, Esq., in Support of Dhandi Transport,

Inc.'s Motion to Bar ("Wynne Decl."), Exhibit 1, at 50. The Site is owned by Robert Melecci,

and, until 1987, Getty and Melecci entered into a contract-dealer relationship, pursuant to which

Getty bought several underground storage ("UST") tanks located on the H.P. Delta site, and

Melecci sold Getty gasoline. Wynne Decl., Exhibit 2, at 4. The USTs were removed in 1987,

and, in 1988, Melecci installed a new gasoline dispensing system at a new location on the site,

which is still in operation at the site today. Wynne Decl., Exhibit 2, at 10. Melecci operated the

new UST dispensing system from 1989 to 2003. Wynne Decl., Exhibit 2, at 11. In 2003, Melecci

---

[2] The other defendants in this matter are Exxon Mobil Corporation and ExxonMobil Oil
Corporation, ExxonMobil Oil Corporation, Exxon Mobil Corporation, Gulf Oil Limited
Partnership, and Cumberland Farms, Inc.

leased the gasoline station operations to H.P. Delta. Wynne Decl., Exhibit 2, at 11. Pursuant to

that lease agreement, Melecci continued to own the USTs and the associated piping system.

Wynne Decl., Exhibit 2, at 11. Dhandi, for its part, was a fuel delivery company that H.P. Delta

hired to deliver gasoline to the H.P. Delta site from approximately 2003 to 2006. *See* Wynne

Decl., Exhibit 8, at 5.

In December of 2004, after a containment sump for the regular gasoline submersible

pump at the H.P. Delta site was observed to be full of fuel during an inspection, NJDEP issued a

spill incident report. *See* Wynne Decl., Exhibit 2, at 11. Beginning in May of 2005 through early

2007, groundwater samples from domestic supply wells located to the west-southwest of the

H.P. Delta site began testing positive for MTBE and other gasoline-related contaminants. *See*

Wynne Decl., Exhibit 2, at 11-16. On August 5, 2007, NJDEP conducted a compliance

inspection of the operating UST system at the H.P. Delta site, which revealed soil contamination

and floating product in observation wells. *See* Wynne Decl., Exhibit 2, at 13. After another

inspection on August 8, 2007, NJDEP issued a UST Field Notice of Violation, which noted

deficiencies in tank overfill protection. A delivery ban was subsequently imposed and an Order

was given to cease use of the USTs. *See* Wynne Decl., Exhibit 2, at 13. On August 16, 2008,

NJDEP issued a Directive and Notice to Insurers (the "Directive") naming H.P. Delta, Inc.,

Rob's Service Center and Melecci, as respondents. The Directive alerted that "several potable

wells had exceedences of MTBE and/or benzene," and that "gross soil contamination and

floating product was observed during an August 2006 compliance inspection." *See* Wynne Decl.,

Exhibit 2, at 14. In response to the Directive, H.P. Delta filed a lawsuit in New Jersey state court

against Melecci (hereinafter, the "State Court Litigation"), alleging that the "primary source of

gasoline and other contaminants were found to come from a former tank field which previously existed at the [H.P. Delta] site until approximately 1987." *See* Wynne Decl., Exhibit 4 at 4. In response, Melecci filed an Answer and Counterclaim, and a Third-Party Complaint against Dhandi, alleging that Dhandi was negligent in its delivery of gasoline. *See* Wynne Decl., Exhibit 5, at 6. In July of 2009, H.P. Delta amended its Complaint to assert a claim against Getty. *See* Wynne Decl., Exhibit 6.

Around the same time, on June 28, 2007, Plaintiffs filed the present matter in the Superior Court of New Jersey, Mercer County "in order to protect and remedy important state interests affected by widespread contamination of the waters of the State of New Jersey with [MTBE], a chemical used in gasoline." Defendant ExxonMobil then removed the matter to this Court on November 2, 2007. On January 3, 2008, the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), issued an order transferring this matter as part of a large multi-district litigation ("MDL") involving MTBE to the United States District Court for the Southern District of New York for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. On April 15, 2011, the State Court Litigation was stayed, based upon Getty's filing of a Third-Party Complaint against H.P. Delta, Melecci and Dhandi in the MDL. *See* Wynne Decl., Exhibit 2, at 4. After pretrial proceedings before the Hon. Shira A. Scheindlin, U.S.D.J. (ret.) (the "MDL Court"), the MDL Panel, on April 15, 2015, entered a Conditional Remand Order, sending the action concerning certain trial sites—including the H.P. Delta Site—to this Court for trial.

In the MDL, Plaintiff alleged that the H.P. Delta site was the source of contamination of the off-site wells, located in the vicinity of Lancaster Road (the "Lancaster Road Wells"). *See*

Wynne Decl., Exhibit 9 (Revised Site Summary Report, prepared by Anthony Brown of Auqilogic, Inc., on behalf of the NJDEP, dated January 2013), at 46. Brown, Plaintiff's expert, prepared a Revised Site Summary pertaining to the alleged groundwater contamination at the H.P. Delta Site (the "Revised Site Summary"). In his report, Brown provided a scale diagram of the H.P. Delta Site and its relation to the off-site Lancaster Road Wells. *See* Wynne Decl., Exhibit 9, at Fig. 8b. The Revised Site Summary also discussed groundwater flow direction at the site. According to the Report, groundwater currently flows to the northwest in the unconsolidated sediments (shallower) zone, and to southeast in the bedrock aquifer (deeper) zone:

> Based on a review of local topography, shallow groundwater would be interpreted to flow southwest toward Pumpkin Patch Brook (LBG, 2010; 008322) near the Site. However, based on recent water levels from monitoring wells near the Site, groundwater in the unconsolidated sediments flows in a northwesterly direction. . . Groundwater flow in the bedrock aquifer zone (i.e., fractured bedrock wells completed from 50 to 64 feet bgs), as monitored by wells MW-01, MW-02 and MW-03, has been reported to be to the south and southeast (LBG, 2010; 006945, 006947 and 006949).

*See* Wynne Decl., Exhibit 9, at 24, 26. Notwithstanding that groundwater currently flows to the northwest and southeast of the H.P. Delta Site, the MTBE plume that is the subject of this case, according to the same report, extends to the west-southwest of the site: "The plume of MTBE contamination is not fully delineated, but extends at least 1,350 feet to the west-southwest of the Site." *See* Wynne Decl., Exhibit 9 at 35. To explain this discrepancy, Brown stated in his report that

> [i]t is likely that gradients in the bedrock in the vicinity of the Site were influenced by pumping at domestic supply wells. Given the distribution of these wells, groundwater in the bedrock likely flowed to the west-southwest when the supply wells were actively pumping.

*See* Wynne Decl., Exhibit 9 at 30.

During discovery, Defendants took the Rule 30(b)(6) deposition of Gary Lipsius, an employee of the NJDEP in the Bureau of Investigation, Design and Construction. *See* Wynne Decl., Exhibit 11, at 1. Mr. Lipsius testified that, although it was "likely" that the H.P. Delta site was the source of the impacts to the Lancaster Road Wells, he was "not certain." *See* Wynne Decl., Exhibit 11, at 63:21-65:6. When asked whether other possible sources included two nearby gas stations, and a convenience store that used to be a gas station, Mr. Lipsius testified that these sites were possible other sources of contamination. *See* Wynne Decl., Exhibit 11, at 310:20-312:21.

Moreover, as relevant to Getty's motion, Brown issued a Supplemental Expert Report in August 2017, in which he stated that "no new data has been generated at the HP Delta Site." *See* Certification of Susan M. Dean ("Dean Cert."), Exhibit A, at 1. He, therefore, did not prepare a site summary addendum as he did for the other three unrelated trial sites. *Id.* He further stated that the "[chemical of concern], restoration goals, and treatment technologies evaluated remain the same as previously noted in the Revised [Feasibility Study]." Dean Cert., Exhibit B, at 1. Despite this testimony, Getty contends that Brown overlooked certain updated data related to the H.P. Delta trial site that Plaintiff produced in March 2017. According to Getty, Plaintiffs' March 1 and March 27, 2017 production contain thousand pages of documents and includes, but is not limited to, documents from 2016 and testing data for the H.P. Delta site from April 2013, December 2014, January 2015, none of which Brown reviewed or considered.

Moving Defendants' motions are just two of many motions filed by the defendants in this matter to exclude the testimony of Plaintiff's expert witnesses, Brown and Robert E. Unsworth.

Plaintiffs also separately filed motions to exclude the testimony of defense experts Michael Kavanaugh, Peter Robelen, Kevin Russell, and Peter Zeeb. A hearing was held on the pending motions related to Brown on January 9th and 10th, 2019, and, afterward, the Court conducted a conference with counsel for all parties. At the conference, the Court directed that the pending *Daubert* motions, except for those related to the H.P. Delta trial site, should be administratively terminated pending additional necessary investigative work at certain trial sites that are the subject of this matter.

## II.     DISCUSSION

Moving Defendants seek to exclude different aspects of Brown's expert opinions. Dhandi and H.P. Delta argue that Brown's opinions as to causation must be excluded because Brown did not properly support his opinion that the contamination at the off-site wells was caused by the contamination of the H.P. Delta wells. Getty, for its part, seeks to have all of Brown's opinions stricken for his failure to consider additional data regarding the site covering 2013 through 2017. In their opposition to Getty's motions, Plaintiffs include a supplementary declaration from Brown ("Brown Supp. Declaration"), that Getty challenges as being an improper update to Brown's report. I will first address the propriety of the Brown Supp. Declaration before turning to the exclusion motions.

### A.  Propriety of the Brown Supplemental Declaration

As an initial matter, Getty Defendants argue that Brown's supplemental declaration, attached as exhibits to Plaintiffs' opposition briefs, is an improper supplementation of Brown's

expert report.[3] Federal Rule of Civil Procedure 26(a)(2)(B) requires the disclosure of expert

reports that must contain, in part:

> (i) a complete statement of all opinions the witness will express and the basis
> and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them; [and]
>
> (iii) any exhibits that will be used to summarize or support them ....

If a party wishes to supplement the expert's report, it must follow the procedures of Federal Rule

of Civil Procedure 26(e), which states that the duty to disclose is triggered when the party "learns

that in some material respect the information is incomplete or incorrect." Courts, therefore, have

"'repeatedly rejected attempts to…'supplement[t]' an expert report with a 'new and improved'

expert report'" in an opposition brief. 8A Charles Alan Wright & Arthur R. Miller, Federal

Practice & Procedure § 2049.1 (3d ed. 2019) (quoting *Gallagher v. Southern Source Packaging,*

*LLC*, 568 F. Supp. 2d 624 (E.D. N.C. 2008)). *See, e.g., MicroStrategy, Inc. v. Business Objects,*

*S.A.,* 429 F.3d 1344, 1353 (Fed. Cir. 2005); *Solaia Tech., LLC v. ArvinMeritor, Inc.,* 361

F.Supp.2d 797, 806 (N.D. Ill. 2005) ("It would appear that Nuschke's much expanded opinion

was prompted solely by ArvinMeritor's summary judgment motion.... This is not the proper role

for supplementation of a report by an expert.").  However, although a declaration should be

stricken if it contains new opinions or information which is contradictory to that set forth in the

---

[3] Plaintiffs also included a supplementary declaration from Brown in response to Dhandi's motion, but Dhandi did not challenge the propriety of the declaration. Nonetheless, in this declaration, Brown merely provided clarification and support for the conclusions that the MTBE from the H.P. Delta wells was the source of the contamination of the Lancaster Road Wells, namely his opinion that groundwater would have flowed towards the Lancaster Road Wells when they were actively pumping. *See Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 284–85 (W.D. Pa. 2009) (refusing to strike expert's declaration that offered merely a clarification of his opinions).

expert report, *see Stein v. Foamex Intern., Inc.,* No. 00–2356, 2001 WL 936566 (E.D.Pa. 2001),

it need not be stricken if it is merely "an elaboration of and consistent with an opinion/issue

previously addressed" in the expert report. *Pritchard*, 263 F.R.D. at 284–85 (citation omitted).

The Third Circuit has noted that there is no "bright line rule" whereby every expert opinion

"must be included in a preliminary report, or forever be precluded." *Hill v. Reederei F. Laeisz*

*G.M.B.H., Rostock,* 435 F.3d 404, 423 (3d Cir. 2006) (finding no error in lower court's

admission of expert rebuttal testimony exceeding scope of expert's original report). While the

applicable case law prohibits an expert from using rebuttal as a "do-over" of an original report,

courts have refrained from "automatically exclud[ing] anything an expert could have included in

his or her original report." *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004). When an

expert's submission is deemed to be an improper supplementation of an expert report, a party

may not "use that information ... at a trial, unless the failure was substantially justified or is

harmless." Fed. R. Civ. P. 37(c)(1).[4]

Although a party that fails to comply with its discovery obligations may be sanctioned,

pursuant to Federal Rule of Civil Procedure 37(c)(1), the Court must first determine whether the

submission of the Declaration constitutes an improper supplementation of an expert report. Here,

---

[4] When a party fails to comply with its duty to supplement, Federal Rule of Civil Procedure 37(c), which governs parties' failure to disclose or supplement disclosures under Rule 26(a), applies. According to the Third Circuit, the Court must consider four factors when considering whether to exclude evidence due to a parties' failure to comply with discovery duties: (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000).

Getty argues that the Brown Supp. Declaration plainly contains the type of information that must be included in an expert's report and, therefore, Plaintiffs must formally move to supplement pursuant to Federal Rule of Civil Procedure 26. Getty contends that, in 2017, Brown should have updated his report—which relied on pre-January 2013 testing results to support his opinions as to necessary off-site monitoring and remediation work to be done at the site—after Plaintiffs themselves produced thousands pages of documents and testing data from 2013 through 2017. Plaintiffs respond that the declaration is proper, as it does not alter Brown's previous opinions, with Brown stating in his declaration that he reviewed the additional data in preparing the Declaration, and asserts that it merely "supplements and is consistent with data that I reviewed in arriving at the opinions I offered in January 2013 with respect to on-site conditions and recommendations as to on-site remediation at the HP Delta site." Brown Supp. Declaration at ¶ 5.

The Court agrees with Plaintiffs and will not strike the Brown Supp. Declaration. Although Brown was mistaken when he stated in 2017 that "no new data has been generated at the HP Delta Site," Dean Cert., Exhibit A, at 1, Getty does not contend that Brown made a deliberate misstatement rather than a careless oversight. Nor is there any dispute that the additional data did not alter Brown's opinions regarding monitoring and remediation. While Getty may disagree with how the data should impact Brown's analysis, such an objection amounts more to an attack on the reliability of Brown's methods, *i.e.* an argument that Brown did not appropriately consider all of the available data in reaching his conclusions. Thus, because Brown does not offer any new opinions based on the updated data, but merely provides an explanation as to why the data did not impact his analysis, the Brown Supp. Declaration is not an

improper supplementation of Brown's expert report. *See Haskins v. First Am. Title Ins. Co.*, No. 10-5044, 2013 WL 5410531, at *2 (D.N.J. Sept. 26, 2013) (refusing to strike expert's "rebuttal opinions" as improper, which merely "rechecked" his analysis…[and] concluded that his analysis…was "unchanged"); *Barnes v. Century Aluminum Co.*, No. 05-62, 2013 WL 1906283, at *6 (D.V.I. May 8, 2013) (refusing to strike expert's declaration that was "a clarification of [his] opinions in response to the defendants' *Daubert* motions…[and] does not change any of his opinions in the declaration or provide any new opinions"); *Pritchard v. Dow Agro Scis.*, 263 F.R.D. at 285; *see also, Reichold, Inc. v. U.S. Metals Ref. Co.,* No. 03–453, 2007 WL 1428559, at *13 (D.N.J. May 10, 2007) (reversing magistrate judge's ruling denying plaintiff's use of supplemental report, explaining that the report "address[ed] an important issue on which [expert] did not have the data to opine at the time of his original report").

Getty relies on *Air Express Int'l v. Log-Net, Inc*, where, as here, a defendant included a certification from an expert in the opposition brief to a *Daubert* motion. No. 12-1732, 2017 WL 3816536, at *6 (D.N.J. Aug. 31, 2017). There, the certification consisted of "various bases for [the expert's] [ ] opinions," which the court deemed to be "the type of information that must be included in an expert report as set forth in Federal Rule of Civil Procedure 26(a)(2)(B)." *Id.* Although the defendant argued that the certification merely "illuminat[ed] the evidence used in ... [the] [Expert] Report," the court, nonetheless, found that it "improperly attempts to expand [the] Expert Report," and that if the defendant wished to include the information contained in the certification, it should have supplemented the report by "following procedures provided under Federal Rule of Civil Procedure 26(e)." *Id.* Here, however, the Brown Supp. Declaration is

not an expansion of the expert report; it merely offers explanations for why the conclusions in the expert report remain unchanged. Formal supplementation is, therefore, unnecessary.

Finally, Getty will not be prejudiced by the consideration of the Brown Supp. Declaration, as "[a]ny prejudice to Defendants can be cured by the allowance of further depositions." *Reichhold*, 2007 WL 1428559, at *13. Indeed, should Getty believe that it needs further discovery regarding Brown's use of the updated data, it will be permitted to pursue limited discovery on the issue. *See Fisher v. Clark Aiken Matik, Inc*., No. 99-1976, 2005 WL 6182824, at *1 (M.D. Pa. Sept. 26, 2005) ("To the extent that Defendants believe that discovery related to the authentication or preparation of the computer-generated animation is required, they may request leave of court to pursue limited discovery on that matter."). The Court will, therefore, not strike the Brown Supp. Declaration.

## B. Motion to Exclude Brown's Opinions

Moving Defendants all seek to exclude or limit Brown's testimony. The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides that:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), clarified the operation and scope of Rule 702 with regard to expert testimony. There, the Court ruled that courts perform a screening function to ensure the relevance and reliability of expert testimony. *Id.* at 589. Put simply, "Rule 702 imposes three distinct substantive restrictions on the

admission of expert testimony: qualifications, reliability, and fit." *Crowley v. Chait*, 322 F.Supp.2d 530, 535 (D.N.J. 2004) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). The standards set forth in *Daubert* operate as a framework to ensure the relevance and reliability of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999). It is the trial judge's role to serve as the gate-keeper in scrutinizing the evidentiary relevance and reliability of the proposed expert submission. *See Daubert*, 509 U.S. at 588–89, 595–97.

Here, Defendants argue that Brown's opinions fail to meet the second prong of the *Daubert* test—reliability. The Third Circuit has stated that "'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-42 (3d Cir. 1994)). This has been interpreted to mean that "an expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). In *Paoli,* the Third Circuit explained that even if the judge believes "there are better grounds for some alternative conclusion," and that there are some flaws in the scientist's methods, if there are "good grounds" for the expert's conclusion, it should be admitted. *Id.* at 744. Therefore, "an expert opinion is not inadmissible because it may contain flaws, nor is it excludable because it provides testimony regarding only one facet or aspect of an action but does not prove the whole case; such vulnerabilities affect the weight of the testimony, not its admissibility." *Feit v. Great-W. Life & Annuity Ins. Co.,* 460 F. Supp. 2d 632, 641 (D.N.J. 2006).

In evaluating whether a particular methodology is reliable, a trial court should consider several factors: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985); *Pineda*, 520 F.3d at 247-48. *see also Elcock,* 233 F.3d at 746 (noting that "each factor need not be applied in every case"). The party wishing to introduce the testimony bears the burden of establishing "by a preponderance of the evidence that their opinions are reliable." *Paoli,* 35 F.3d at 744.

1. Getty

As already discussed, Getty seeks to exclude the entirety of Brown's report on the basis that he failed to consider four years-worth of data on the H.P. Delta site after 2013, contending that without such data, Brown necessarily resorted to unsupported assumptions and pure speculation to reach his opinions regarding both on-site and off-site contamination and remediation. Plaintiffs disagree, arguing that the additional data was, and is, only relevant to *on-site* conditions, and it actually supports Brown's 2013 conclusions that additional on-site remediation is required. As to off-site conditions, Brown states in his Declaration that this additional data "had no bearing upon, and would have in no way undercut or otherwise affected, the reliability of his opinion that *off-site* contaminant migration continues and requires continued off-site monitoring and remediation." Brown Supp. Decl. at ¶ 8.

As an initial matter, that Brown's report does not consider the most up-to-date data is not necessarily problematic, as the Supreme Court has stated that "[t]rained experts commonly extrapolate from existing data." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). An expert's report is not inherently unreliable if new data is released after publishing an initial report when the new data merely updates the data on which the expert relied in drafting his initial report. *See Forest Labs., Inc. v. Ivax Pharm., Inc*., 237 F.R.D. 106, 117 (D. Del. 2006) ("As for Defendants' objection based on the scope of Dr. Lader's expert report, the Court concludes that Dr. Lader should not be precluded from testifying on an updated version of the statistical analysis plan already discussed in his expert report, where as here, the only available analysis at the time was the 'prefinal' analysis"). Although reliance on outdated data can be problematic when an expert's opinions are "connected to existing data only by the *ipse dixit* of the expert" such that there may be "too great an analytical gap between the data and the opinion preferred" to support inclusion of the testimony, a challenging party must still demonstrate that failing to consider the data renders the expert's opinion unreliable. *See In re TMI Litig*., 193 F.3d 613, 682 (3d Cir. 1999) (citing *Joiner*, 522 U.S. at 137).

Here, Getty has made little effort to demonstrate how Brown's reliance on outdated data renders his opinions unreliable; instead, Getty primarily argues that all of Brown's opinions should be excluded simply because he did not consider the most up-to-date data. *See* Getty's Mot. To Exclude, ECF No. 109-2 at 8 ("Brown's January 2013 Report and the opinions therein are outdated and unreliable since no analysis of the updated factual data and documentation was made and because Brown's opinions regarding restoration, treatment and related costs rely on those outdated and unreliable opinions, his opinions on restoration and related cost are likewise

unsupported and unreliable."). In other words, in Getty's view, Brown simply did not consider the best data in reaching his conclusions, which in and of itself is not a proper basis to exclude an expert's testimony. *See Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 233 (E.D. Pa. 2017) (citing *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("Whether [expert] relied on the best data in forming his opinions is a question for the jury.")).

Moreover, to the extent Getty *does* dispute Brown's claims regarding the impact of the additional data, it does so by pointing to the opinions of its own expert, Michael Kavanaugh, *see* ECF No. 120 at 2, who opined that,

> Mr. Brown does not consider the fact that 165 Jordan Road was sampled in 2017 and the fact that neither MTBE nor [tert-butyl alcohol] were detected above method detection limits. Failure to consider this data point illustrates an apparent reluctance to support the application of [monitored natural attenuation] to address off-site contamination, a remedy component that Mr. Brown also includes in his own proposed remedial strategy.

*See* Declaration of Michael C. Kavanaugh at ¶ 20, attached to the Certification of Susan M. Dean ("Dean Cert.") as Exhibit A (citations omitted). Kavanaugh and Brown, are, therefore, at loggerheads about whether including this 2017 data would have necessarily altered any opinions about offsite remediation. Thus, "[w]hat is presented here is a classic battle of the experts over disputed facts, to be settled by the finder of fact; it does not affect admissibility." *Dzielak v. Whirlpool Corp.*, No. 12-0089, 2017 WL 1034197, at *26 (D.N.J. Mar. 17, 2017); *see also e.g., In re Gabapentin Patent Litig.*, No. 00–2931, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011) (concluding that defendants' critiques of plaintiffs' experts' methodology and inconsistent conclusions presented "a battle of the experts, and both sides will be permitted to present expert testimony on these issues and to cross-examine the other side's expert witnesses"). Indeed,

Brown and Kavanaugh base their opinions on different interpretations of this 2017 data, and as the Third Circuit has explained, "an expert is… permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury. It is also…a proper subject for cross-examination." *Walker v. Gordon,* 46 F. App'x 691, 695–96 (3d Cir 2002) (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).[5]

Therefore, although Getty disagrees that the new data is consistent with Brown's opinions, Getty has not shown that failing to consider such data renders Brown's methods unreliable. Thus, Brown's opinions will not be excluded based on his failure to consider the updated data.

2. Dhandi/H.P. Delta

H.P. Delta and Dhandi seek to exclude only the portion of Brown's opinion related to causation, arguing that his opinions in that regard are unsupported. *See In re Paoli.*, 35 F.3d at 742 ("*Daubert* explains that the language of Rule 702 requiring the expert to testify to *scientific knowledge* means that the expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief"). They argue that he 1) failed to support his opinion that the groundwater flowed in the direction of the Lancaster Road Wells when it is uncontested that the groundwater is not currently flowing in that direction; and 2) he failed to consider other potential sources of contamination of the Lancaster Road Wells.

---

[5] Getty relies on *Marcel v. Placid Oil Co.,* 11 F.3d 563, 567–568 (5th Cir.1994), where the court upheld the exclusion of expert testimony based on "outdated, statistically suspect, and untrustworthy evidence." Here, however, although Getty contends that Brown's opinions are based on evidence that is outdated, they have not shown how such this evidence is untrustworthy, such that it would have a material impact on Brown's conclusions.

First, Dhandi and H.P. Delta take issue with Brown's opinions in Section 5.3.2 of his 2013 Report regarding groundwater flow direction and gradient at the H.P. Delta site. According to Dhandi and H.P Delta, Brown's conclusion that the Lancaster Road wells "likely" altered the groundwater flow direction while they were pumping is "completely unsupported," given that Brown did not rely on any data from the period in which the wells were pumping. In the report, Brown noted that MTBE was found in high concentrations in the Lancaster Road wells beginning in 2005 and 2006, after a turbine spill containment sump on the H.P. Delta site was reportedly found to be filled with gasoline. Although the groundwater was not flowing in the west-southwest direction towards the Lancaster Road wells at the time that Brown issued his report, he concluded the following:

> It is likely that gradients in the bedrock in the vicinity of the Site were influenced by pumping at domestic supply wells. Given the distribution of these wells, groundwater in the bedrock likely flowed to the west-southwest when the supply wells were actively pumping.

Wynne Decl., Exhibit 9 at 30. In support of this conclusion, Brown also identified the pathways of contaminant migration at the site. He found there to be "[n]o significant confining layer…beneath, or down-gradient of, the Site that could prevent the downward vertical migration of COCs," and that "[a]vailable data indicate a downward vertical gradient between the unconsolidated sediment zone and bedrock." Wynne Decl., Exhibit 9 at 38. Based on this, he found that "[t]he migration of COCs was likely 'controlled' by the pumping of domestic WSWs west- southwest of the Site (*i.e., the Lancaster wells*) prior to 2007. Since pumping at these wells ceased, the direction of plume movement has changed to the north-northwest in the unconsolidated sediments and south-southeast in the bedrock." Wynne Decl., Exhibit 9 at 39. In

his Declaration, Brown further clarified that groundwater must have flowed to those points when the wells were pumping: that is, "when operating, the Lancaster wells would be the major point of groundwater discharge proximate to the HP Delta Site. Groundwater flows to points of discharge." Declaration of Anthony Brown in Support of Opp. to Dhandi's Motion to Exclude ("Dhandi Decl."), at ¶ 8.

Given how Brown arrived at his conclusion, Dhandi and H.P. Delta are mistaken that his opinion is "completely unsupported." To the contrary, Brown supported his conclusion with his analysis of the groundwater migration pathways beneath the Site and the surrounding areas, and his application of certain scientific principles, namely that, because groundwater flows towards points of discharge and because the Lancaster Road Wells were the major point of groundwater discharge in the area, the groundwater likely flowed towards these wells at the time that they were pumping. Dhandi and H.P. Delta merely complain that Brown reached his conclusion without sampling data from the period in question, but they do not challenge the scientific basis for Brown's migration pathways analysis, nor do they challenge validity of Brown's assessment of scientific principles. Sampling data might have further buttressed Brown's opinions, but Dhandi and H.P. Delta have not shown how, without such data, Brown's methodology in this regard is unsound or somehow unreliable.[6]

In a case similar to the current matter, *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, a district court considered whether a hydrologist, who opined that groundwater

---

[6] This is not an instance, like in *In Re TMI Litigation,* on which Dhandi and H.P. Delta rely, where an expert "merely assumed that his observations of two bursts of radiation activity were the result of the [chemical] plume passing over his area of southern Maine," which was "supported by nothing other than conjecture." 927 F. Supp. 834, 839 (M.D. Pa. 1996). Here, whatever the weight Brown's report is ultimately given by a jury, he has supported his opinions with more than mere conjecture.

contamination was due primarily to a chemical transported through an aquifer, provided admissible opinions. 90 F. Supp. 3d 746, 756–57 (S.D. Ohio 2015). Rejecting the defendants' argument that the expert did not adequately support his conclusion, the court held that the expert "need not identify the particular contours of the capture zone, perform a groundwater flow model, or follow the methodology in his text book in order for his opinion about the primary River Pathway to be admissible under Rule 702." *Id.* at 756. It was, rather, enough that, "the theory rests on other rational explanations and facts on the record." *Id.* at 757. Here, too, despite the fact that Brown did not consider certain data points that Dhandi and H.P. Delta may have preferred, the expert's opinion rests "on a reasonable factual basis" that they have failed to contest. Thus, as in *Little Hocking*, "[w]hile Defendant suggests [Brown] should have used other, more conclusive measures to prove [his conclusions], an expert need not base his opinion on the 'best possible evidence,' or the 'most ideal scientific evidence' in order for it to gain admissibility." *Id.* (quoting *U.S. ex rel. Martin v. Life Care Centers of Am., Inc.,* No. 08–251, 2014 WL 4816006, at *2–3 (E.D.Tenn. Sept. 29, 2014)). As such, "challenges to the accuracy or import of such evidence go to the accuracy of the expert's conclusions, not to their reliability, and bear on 'the weight of the evidence rather than on its admissibility.'" *Id.* (quoting *In re Scrap Metal,* 527 F.3d at 529–31 (citing *Jahn v. Equine Services,* 233 F.3d 382 (6th Cir. 2000) (finding that opinions of the proffered testimony may very well be 'shaky, but because the opinions were based upon facts in the record, and were not assumptions or guesses, challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony)).

In contrast to *Little Hocking*, in *Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509, 523–24 (6th Cir. 2013), another groundwater contamination case, the Sixth Circuit affirmed the

exclusion of an expert's testimony regarding whether groundwater contamination

"could *only* have originated from the plume" because the expert was "not a soil vapor expert, and

he did not complete any vapor pathway analyses." Here, however, Dhandi and H.P. Delta have

not challenged Brown's expertise and there is no dispute that Brown conducted a pathway

analysis, which, importantly, H.P. Delta and Dhandi have not suggested to be scientifically

unsound. As such, Brown's opinion as to causation, even if it is not based on the "most ideal

scientific evidence"— as Defendants contend—is admissible. *See also Idaho Rural Council v.

Bosma*, 143 F. Supp. 2d 1169, 1185 (D. Idaho 2001) (refusing to strike testimony of expert who

opined that water from pond contaminated a nearby spring when expert relied upon only "a

photograph of Faulkner Pond [the source of the contamination], an Idaho Department of

Agriculture report, his personal observations of bedrock in the area, and elevated nitrate levels at

Butler Spring.").

The same goes for Brown's supposed failure to consider other alternative sources of

contamination of the Lancaster Road Wells. Dhandi and H.P. Delta argue that Brown's report

contains only a single, conclusory sentence regarding possible alternative sources for the

Lancaster Road contamination: "No off-site sources of petroleum hydrocarbon contamination

have been identified." Wynne Decl., Exhibit 9 at 38. According to Dhandi and H.P. Delta, this

sentence is contradicted by the testimony of Plaintiffs' corporate representative, Gary Lipsius,

who testified that, although it was "likely," that the H.P. Delta Site was the source of the impacts

to the Lancaster Road wells, he was "not certain," and that potential other sources of

contamination could be a nearby gas station or the convenience store across the street.

However, Lipsius' statements say nothing about the reliability of Brown's expert opinion

in considering and ruling out potential other sources of contamination. In that regard, Lipsius

testified in August 2012, months before Brown drew his conclusions in his January 2013 Report. *See* Wren Declaration, Exhibit B. That NJDEP's corporate representative lacked knowledge in 2012 regarding other potential sources of contamination, does not establish that Brown, after conducting his investigation, knew of other contamination sources in 2013. Further, in his Declaration, Brown details the process he went through in ruling out other potential sources of contamination:

> I looked for any NJDEP leaking underground storage tank (LUST) reports for other stations proximate to the plume, but found no evidence suggesting a possible other source. The only other service stations were to the south and groundwater was likely not flowing from these stations to the area of the plume. In addition, the plume shape and distribution of MTBE concentrations suggested a source immediately to the northeast of the Lancaster Road wells (i.e., HP Delta), not further to the south.

Dhandi Decl. at ¶ 14. Such an explanation, whether or not it is ultimately accepted by the jury, belies Dhandi and H.P. Delta's suggestion that Brown entirely failed to rule out alternative sources of contamination.

Moreover, that there may have been other sources of contamination does not necessarily render Brown's opinion that the H.P. Delta site was *a source* of contamination inadmissible. Indeed, in order to prevail in the case, Plaintiffs need not prove that the H.P. Delta trial site was the sole source of the contamination at the Lancaster Road wells; they need only prove that it was *a source. See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 08 CIV. 312 2014 WL 1040665, at *4 (S.D.N.Y. Mar. 14, 2014) ("Getty need not prove that discharges by Dhandi or H.P. Delta at the Site were the primary or proximate cause of the contamination at the off-site wells. Evidence regarding other potential sources of contamination is not relevant. Getty has produced evidence from which a fact finder could reasonably conclude that Dhandi and H.P.

Delta discharged gasoline at the Site, and that discharges at the Site contaminated the off-site wells."); *see also Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 462 (D.N.J. 1999) ("[The expert's] failure to evaluate all available options neither renders his methodology unreliable nor his report inadmissible but, rather, goes to the weight of his testimony.").

In sum, Dhandi and H.P. Delta's objections fall within the scope of weight, rather than admissibility. Indeed, they do not contest the accuracy of Brown's calculations, instead only arguing that Brown did not consider sufficient data in reaching his conclusions that the contamination at the H.P. Delta site caused contamination in the Lancaster Road wells. Defendants, in essence, ask the Court to exclude all of Brown's opinions because of "some flaws" in his methodologies and because there "may be some better grounds for an alternative conclusion," an approach that the Third Circuit has rejected. *In re Paoli,* 35 F.3d at 744.. As the Third Circuit has advised, however:

> In *Daubert,* the Court noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," …. Clearly, the Court envisioned cases in which expert testimony meets the *Daubert* standard yet is "shaky" and cases in which admissible expert testimony provides only a "scintilla" of support for a claim or defense. Put differently, an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue—but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production.

*Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (citations omitted). That is the case with Brown's opinion here: although Defendants argue that the expert may not have presented particularly strong support for his opinions, those disputes are better addressed at trial than through a *Daubert* motion. The Court will, therefore, not exclude Brown's opinions regarding causation at the H.P. Delta Site.

### III.    <u>**CONCLUSION**</u>

For the foregoing reasons, Moving Defendants' motions are denied, and the opinions of

Plaintiff's expert, Andrew Brown, as to the H.P. Delta trial site will not be excluded.


Dated:  August 28, 2019                                    <u>/s/ Freda L. Wolfson</u>
                                                                             Hon. Freda L. Wolfson
                                                                             U.S. Chief District Judge